[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-13829
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 4, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-80309-CV-CMA

FRIENDS OF THE EVERGLADES,
FLORIDA WILDLIFE FEDERATION,

Plaintiffs-
Counter-Defendants-
Appellees
Cross-Appellants,

FISHERMEN AGAINST DESTRUCTION OF THE ENVIRONMENT,

Plaintiff-
Counter-Defendant
Appellee,

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,

Intervenor-Plaintiff-
Counter-Defendant-
Appellee
Cross-Appellant,

versus

SOUTH FLORIDA WATER MANAGEMENT DISTRICT,

Defendant-
Counter-Claimant-
Cross-Appellee,

CAROL WEHLE, Executive Director,

UNITED STATES OF AMERICA,
U.S. SUGAR CORPORATION,

Intervenor-Defendants-
Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 4, 2009)

Before DUBINA, Chief Judge, CARNES, Circuit Judge, and GOLDBERG,[*]

Judge.

CARNES, Circuit Judge:

This appeal turns on whether the transfer of a pollutant from one navigable body of water to another is a "discharge of a pollutant" within the meaning of the Clean Water Act, 33 U.S.C. § 1362(12). If it is, a National Pollution Discharge Elimination System permit is required. 33 U.S.C. §§ 1311(a), 1342(a). The Act

_____

[*] Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

defines "discharge of a pollutant," but the meaning of that definition is itself disputed. During the course of this litigation, the Environmental Protection Agency adopted a regulation addressing this specific matter. The issue we face, after we dispose of a preliminary Eleventh Amendment question, is whether we owe that EPA regulation deference under Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984).

## I.

The unique geography of South Florida is once again before us. See Miccosukee Tribe of Indians of Fla. v. United States, __ F.3d ___, No. 08-10799, 2009 WL 1199871, at *1 (11th Cir. May 5, 2009). Lake Okeechobee is part of that geography. Historically, the lake had an ill-defined southern shoreline because during rainy seasons it overflowed, spilling a wide, shallow sheet of water overland to the Florida Bay. "But progress came and took its toll, and in the name of flood control, they made their plans and they drained the land."[1]

In the 1930s the Herbert Hoover Dike was built along the southern shore of Lake Okeechobee. It was intended to control flooding but failed during the hurricanes of 1947 and 1948. Congress then authorized the Central and Southern Florida Flood Project; as part of it the Army Corps of Engineers expanded the

---

[1] John Anderson, Seminole Wind, on Seminole Wind (BMG Records 1992).

3

Hoover Dike and built pump stations including S-2, S-3, and S-4. Under the modern version of that project, nearly all water flow in South Florida is controlled by a complex system of gates, dikes, canals, and pump stations.

The area south of Lake Okeechobee's shoreline was designated the Everglades Agricultural Area. The Corps dug canals there to collect rainwater and runoff from the sugar cane fields and the surrounding industrial and residential areas. [2] Not surprisingly, those canals contain a loathsome concoction of chemical contaminants including nitrogen, phosphorous, and un-ionized ammonia. The water in the canals is full of suspended and dissolved solids and has a low oxygen content.

Those polluted canals connect to Lake Okeechobee, which is now virtually surrounded by the Hoover Dike. The S-2, S-3, and S-4 pump stations are built into the dike and pump water from the lower levels in the canals outside the dike into the higher lake water. They do that by spewing water through the dike and into "rim canals"open to the lake. This process moves the water containing Agricultural Area contaminants uphill into Lake Okeechobee, a distance of some sixty feet. The pumps do not add anything to the canal water; they simply move it

---

[2] The canals are commonly called the EAA canals, and we will refer to them as the agricultural canals, although they also contain industrial and residential runoff.

through pipes.  At full capacity, the pumps within the S-2, S-3, and S-4 stations can each move 900 cubic feet of water per second—more than 400,000 gallons per minute.  The South Florida Water Management District operates the pumping stations.

Two organizations, the Friends of the Everglades and the Fishermen Against the Destruction of the Environment, filed this lawsuit against the Water District in 2002.  The plaintiffs (whom we will call collectively the Friends of the Everglades) sought an injunction to force the Water District to get a permit under the Clean Water Act's National Pollution Discharge Elimination System (NPDES) program before pumping the polluted canal water into the lake.  The court allowed a number of interveners to enter the lawsuit.  Asserting that the pollution of Lake Okeechobee threatens its way of life, the Miccosukee Tribe joined on the plaintiffs' side.  The United States, "on behalf of" the EPA and the Corps, joined on the defense side, as did the U.S. Sugar Corporation.  In an amended complaint, the plaintiffs added the Water District's executive director as a defendant.

In early 2006 there was a two-month bench trial in the United States District Court for the Southern District of Florida.  See Miccosukee Tribe v. S. Fla. Water Mgmt. Dist., 559 F.3d 1191, 1192–94 (11th Cir. 2009) (describing that trial).  After the trial, the district court decided that the Water District was immune under

5

the Eleventh Amendment and dismissed it from the case, but the court kept the executive director in the lawsuit under the Ex parte Young doctrine. See Ex parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908). It concluded that operating the S-2, S-3, and S-4 pump stations without an NPDES permit violated the Clean Water Act. In June 2007 the court granted an injunction against the executive director of the Water District that required her to "apply . . . for a NPDES permit forthwith." All of the defendants except the Water District appealed the part of the final judgment that enjoined the executive director, while the plaintiffs cross-appealed the part dismissing the Water District under the Eleventh Amendment.

## II.

We begin with the cross-appeal, which contests the dismissal of the Water District on Eleventh Amendment immunity grounds. The parties disagree mightily about this issue and had gotten so wrapped up in the arguments about it that none of them had stepped back to ask why it matters. We asked that question of the attorneys at oral argument, and once they got past the deer-in-the-headlights moment they could offer no good reason why we, or they, should care if the Water District is in or out of this lawsuit. We believe that it does not matter at all.

No party disputes that the executive director of the Water District has been properly sued under the Ex parte Young doctrine. That doctrine provides an

6

exception to Eleventh Amendment immunity for lawsuits against state officials as long as the plaintiffs seek only prospective injunctive relief to stop ongoing violations of federal law. See Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1219 (11th Cir. 2000). And that is all the plaintiffs in this case seek. That relief can be obtained as readily by enjoining the real-person executive director as it could be by enjoining both her and the Water District. See Fed. R. Civ. P. 25 (providing for automatic substitution of successors upon the death or end of term of the officer named as the original party). If anything, injunctions against real people are more easily enforced than those against corporate or government entities because real people can be put in jail.

At one time it appeared that the Eleventh Amendment issue might matter because the executive director had initially argued that some of the relief requested by the Friends of the Everglades was beyond the proper scope of the Ex parte Young doctrine. If true, that part of the requested relief would have been unavailable unless the Water District itself could be sued. But Jonathan Glogau, the attorney representing the Water District, conceded at oral argument that if the plaintiffs are entitled to the relief they seek, all of that relief can be obtained by

enjoining the executive director.[3]  We are entitled to rely on that concession

because James Nutt, the attorney representing the executive director, assured us at

the beginning of the arguments that Glogau would speak on the Eleventh

Amendment issue for the executive director as well as for the Water District.

Two-and-a-half weeks after oral argument, however, we received a

supplemental letter from attorney Nutt in which, referring to himself in the third

person, he stated:  "The Executive Director's counsel did not have an opportunity

to address the Court's question, posed at the very end, whether the remedies

available against the Executive Director through the fiction of Young are the same

as the remedies available as [sic] against the District were it not immune. They are

not."  The belated letter is not helpful.  As a general matter it is conceivable that

---

[3]  Counsel:  In this case, all of the relief that [the plaintiffs] wanted, they got.

Court:  Alright, let me ask you this: Are you now conceding to this Court that under Ex parte Young, with the Director in, all of the relief that they are now seeking they can obtain through the Director?

Counsel:  Yes.

Court: Okay.  (OA Trans.,  Jan. 16, 2009)

remedies available against the executive director might not match those available against the Water District, if it is not protected by the Eleventh Amendment. But we are not dealing with a general matter. We are dealing with this particular case. The only remedies sought are prospective injunctive relief of the sort which, if granted, would be obtained through judicial process applied against the executive director, who is responsible for the operation of the Water District. See Fla. Stat. § 373.083.

The plaintiffs have the greatest interest in the availability of remedies. They are satisfied that, as the attorney for the Water District assured us at oral argument, "the remedies sought by Plaintiffs can be obtained against the Executive Director of the District." We are, too. To enjoin the executive director of the Water District is for all practical purposes to enjoin the Water District. And equity is practical.

An issue is moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief." Fla. Ass'n of Rehab. Facilities, Inc., 225 F.3d at 1217; see also Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 1951 (1969). To decide a moot issue is to issue an advisory opinion, one unnecessary to the judicial business at hand and outside the authority of Article III courts. Fla. Ass'n of Rehab. Facilities, 225 F.3d at 1216–17; see also B&B Chem.

9

Co. v. EPA, 806 F.2d 987, 989 (11th Cir. 1986) ("A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot."). To decide questions that do not matter to the disposition of a case is to separate Lady Justice's scales from her sword. That we will not do. Cf. George E. Allen, The Law as a Way of Life, 27 (1969) ("The scales of justice without the sword is the impotence of law.").

**III.**

Having disposed of the Eleventh Amendment issue, we turn now to whether the S-2, S-3, and S-4 pumps require NPDES permits. The Clean Water Act bans the "discharge of any pollutant" without a permit. 33 U.S.C. §§ 1311, 1342(a)(1). "Discharge" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

It is undisputed that the agricultural and industrial runoff in the canals contains "pollutants," that Lake Okeechobee and the canals are "navigable waters," and that these three pump stations are "point sources" even though they add nothing to the water as they move it along. See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe, 541 U.S. 95, 102, 105, 124 S. Ct. 1537, 1542–43 (2004). The question is whether moving an existing pollutant from one navigable water body

10

to another is an "addition . . . to navigable waters" of that pollutant.[4]  The district court decided that it is, but that decision came before the EPA adopted its regulation.  Our review is de novo. United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th Cir. 1999).

## A.

The Water District's central argument is based on the "unitary waters" theory.  That theory is derived from the dictionary definition of the word "addition," which is not defined in the Act.  See generally  S.D. Warren Co. v. Me. Bd. of Envtl. Prot., 547 U.S. 370, 376, 126 S. Ct. 1843, 1847 (2006) (stating that an undefined statutory term is to be read "in accordance with its ordinary or natural meaning" (quotation omitted)).  The dictionary definition of "addition" is

---

[4]  The permitting requirement does not apply unless the bodies of water are meaningfully distinct. Miccosukee, 541 U.S. at 112, 124 S. Ct. at 1547.  The district court concluded that Lake Okeechobee and the agricultural canals are meaningfully distinct based on ten fact findings that it detailed at considerable length.  Our review of those findings is limited to looking for clear error, see Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1512 (1985), and the defendants do not even challenge them as clearly erroneous.  Given the fact findings the district court made, we are satisfied that the agricultural canals and Lake Okeechobee are meaningfully distinct water bodies.

The EPA wrote an opinion letter that attempted to build a case for the waters not being meaningfully distinct.  That letter is not entitled to Chevron deference.  See Christensen v. Harris County, 529 U.S. 576, 587, 120 S. Ct. 1655 (2000) ("Interpretations such as those in opinion letters . . . do not warrant Chevron-style deference.").  Applying Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161 (1944), we find the EPA's informal view of the term "meaningfully distinct" unpersuasively narrow.

11

"to join, annex, or unite" so as to increase the overall number or amount of something. Webster's Third New International Dictionary 24 (1993).

The unitary waters theory holds that it is not an "addition . . . to navigable waters" to move existing pollutants from one navigable water to another. An addition occurs, under this theory, only when pollutants first enter navigable waters from a point source, not when they are moved between navigable waters. The metaphor the Supreme Court has adopted to explain the unitary waters theory is: "If one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot." Miccosukee, 541 U.S. at 110, 124 S. Ct. at 1545–46 (alteration and quotation marks omitted). Under that metaphor the navigable waters of the United States are not a multitude of different pots, but one pot. Ladling pollution from one navigable water to another does not add anything to the pot. So no NPDES permit is required to do that.

The unitary waters theory has a low batting average. In fact, it has struck out in every court of appeals where it has come up to the plate. See, e.g., Catskill Mountains Ch. of Trout Unlimited, Inc. v. City of New York (Catskills I), 273 F.3d 481, 491 (2d Cir. 2001) ("[T]he transfer of water containing pollutants from one body of water to another, distinct body of water is plainly an addition and thus

12

a 'discharge' that demands an NPDES permit."); Catskill Mountains Ch. of Trout Unlimited, Inc. v. City of New York (Catskills II), 451 F.3d 77, 83 (2d Cir. 2006) (concluding that "[t]he City also reasserts the unitary-water theory of navigable waters. Our rejection of this theory in Catskills I, however, is . . . not undermined" by Miccosukee, 541 U.S. 95, 124 S. Ct. 1537); Dague v. City of Burlington, 935 F.2d 1343, 1354–55 (2d Cir. 1991) (rejecting the idea that pollutants are 'added' only on first entry into any navigable water); Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1296 (1st Cir. 1996) ("[T]here is no basis in law or fact for the district court's 'singular entity' [unitary waters] theory."); N. Plains Res. Council v. Fidelity Exploration and Dev., 325 F.3d 1155, 1163 (9th Cir. 2003). Even the Supreme Court has called a strike or two on the theory, stating in Miccosukee that "several NPDES provisions might be read to suggest a view contrary to the unitary waters approach." 541 U.S. at 107, 124 S. Ct. at 1544. The Court has not, however, called the theory out yet.

We have no controlling circuit precedent on the unitary waters theory. We did at one time decide to reject it, but that decision was vacated. See Miccosukee Tribe v. S. Fla. Water Mgmt. Dist., 280 F.3d 1364, 1368 (11th Cir. 2002) (concluding that "addition . . . to navigable waters" includes pumping polluted water from one navigable water body into another), vacated, Miccosukee, 541

13

U.S. at 112, 124 S. Ct. at 1547. Parts of decisions that are vacated and have not been reinstated "have no legal effect whatever. They are void." United States v. Sigma Int'l, Inc., 300 F.3d 1278, 1280 (11th Cir. 2002) (en banc). We are free to give statements in a vacated opinion persuasive value if we think they deserve it. See Tallahassee NAACP v. Leon County, 827 F.2d 1436, 1440 (11th Cir. 1987).

In Miccosukee, we addressed whether the law required an NPDES permit before polluted water could be moved through the S-9 pump from some particular Everglades canals into a water conservation area. 280 F.3d at 1367. In a footnote, we declined to adopt the unitary waters theory. Id. at 1368 n.5 ("We reject the Water District's argument that no addition of pollutants can occur unless pollutants are added from the outside world insofar as the Water District contends the outside world cannot include another body of navigable waters."). Instead we said that "the receiving body of water is the relevant body of navigable water" and that "the relevant inquiry is whether—but for the point source—the pollutants would have been added to the receiving body of water." Id. at 1368. For that proposition we cited Catskills I, a Second Circuit decision rejecting the unitary waters theory. Because the polluted canal water would not have flowed into the conservation area but for S-9's pumping, we concluded that S-9 was adding pollutants to a meaningfully distinct water body, so an NPDES permit was

14

required.  Id. at 1368–69.  The Supreme Court vacated our decision and remanded for further factfindings, however, because the existing record did not convince it that the canals and the water conservation area were meaningfully distinct water bodies.  Miccosukee, 541 U.S. at 112, 124 S. Ct. at 1547.  The Court also stated that the Water District's unitary waters argument was to be available on remand. Id. at 112, 124 S. Ct. at 1547.

In sum, all of the existing precedent and the statements in our own vacated decision are against the unitary waters theory.  That precedent and those statements take the view that the transfer of pollutants from one meaningfully distinct navigable body of water to another is an "addition . . . to navigable waters" for Clean Water Act permitting purposes.  If nothing had changed, we might make it unanimous.  But there has been a change.  An important one.  Under its regulatory authority, the EPA has recently issued a regulation adopting a final rule specifically addressing this very question.  Because that regulation was not available at the time of the earlier decisions, they are not precedent against it.  We are the first court to address the  "addition . . . to navigable waters" issue in light of the regulation—to decide whether the regulation is due Chevron deference.

**B.**

The EPA's new regulation, which became final on June 13, 2008, explains that it was adopted to:

> clarify that water transfers are not subject to regulation under the National Pollution Discharge Elimination System (NPDES) permitting program. This rule defines water transfers as an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use.

NPDES Water Transfers Rule, 73 Fed. Reg. 33,697–708 (June 13, 2008) (codified at 40 C.F.R. § 122.3(i)).  Everyone agrees that the EPA's regulation is entitled to Chevron deference if it is a reasonable construction of an ambiguous statute. Under Smiley v. Citibank, 517 U.S. 735, 740–41, 116 S. Ct. 1730, 1734 (1996), and United States v. Morton, 467 U.S. 822, 835 n.21, 104 S. Ct. 2769, 2776 n.21 (1984), it does not matter that the regulation was proposed and issued well after the beginning of this lawsuit.  Neither does it matter if it was done in response to this or similar lawsuits.  See Barnhart v. Walton, 535 U.S. 212, 221, 122 S. Ct. 1265, 1271 (2002).  Nor does it matter whether the new regulation is a dramatic shift in EPA policy.  Natl. Cable & Telecomm. Assoc. v. Brand X Internet Servs., 545 U.S. 967, 981, 125 S. Ct. 2688, 2699 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the Chevron framework.").

16

All that matters is whether the regulation is a reasonable construction of an ambiguous statute. Chevron, 467 U.S. at 842–43, 104 S. Ct. at 2781 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); id. at 844, 104 S. Ct. at 2782 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."); Sierra Club v. Johnson, 541 F.3d 1257, 1265 n.3 (11th Cir. 2008) ("[A] court must give effect to an agency's reasonable interpretation of an ambiguous statute."). In other words, there must be two or more reasonable ways to interpret the statute, and the regulation must adopt one of those ways. Those two requirements are obviously intertwined. See Matthew C. Stephenson & Adrian Vermeule, Chevron Has Only One Step, 95 Va. L. Rev. 597 (2009); Orin S. Kerr, Shedding Light on Chevron: An Empirical Study of the Chevron Doctrine in the U.S. Courts of Appeals, 15 Yale J. on Reg. 1, 30 (1998) (examining 200 court of appeals cases applying Chevron and finding that in 28 percent of them the inquiry was collapsed into the single question of whether the interpretation was reasonable).

The Friends of the Everglades' position is that the EPA's regulation does not warrant Chevron deference because the meaning of the "addition . . . to

17

navigable waters" language is clear and its lack of ambiguity forecloses the unitary waters theory. Cf., e.g., Ala. Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300, 1312 (11th Cir. 2002) (finding that, because "using traditional tools of statutory construction," the Nuclear Waste Policy Act provision in question was clear, no level of deference applied to the agency's contrary interpretation); Brand X, 545 U.S. at 982–83, 125 S. Ct. at 2700 ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."). The defendants have two alternative positions. Their bolder position is that the EPA's regulation mirrors the unambiguous meaning of the statute. Their more modest one is that even if the statute is ambiguous, the regulation is one reasonable interpretation of it. The true conflict, and most of our discussion, centers on whether there is ambiguity.

## C.

Both sides pitch several decisions to us. The Water District, arguing for ambiguity, throws us National Wildlife Federation v. Consumers Power Co., 862 F.2d 580 (6th Cir. 1988), and National Wildlife Federation v. Gorsuch, 693 F.2d 156 (D.C. Cir. 1982). In those cases the courts concluded that the "discharge of a pollutant" language in the Clean Water Act was ambiguous and deferred to the

18

EPA's view that dams did not add pollutants, which meant that no NPDES permits were necessary. 862 F.2d at 584–85; 693 F.2d at 183. The issues those cases addressed, however, were different from the one before us.

In Gorsuch the National Wildlife Federation sued the EPA for failing to require NPDES permits for dams. 693 F.2d at 161. The man-made dams and their reservoirs caused changes in the water's temperature, nutrient loads, and oxygen content, and the affected water was then released through the dams into the rivers below. Id. The EPA gave two reasons why no permit was required: (1) the changes caused by the dams were not pollutants; and (2) even if they were, releasing water through a dam did not add those pollutants to the water because the water would have reached the downstream river anyway, and its passage through the dam did not change it. Id. at 165. The D.C. Circuit concluded that neither the language of the statute nor its legislative history conclusively supported either side's position about what "discharge of a pollutant" meant under the circumstances of that case, so the court deferred to the EPA's position.[5] Id. at 175, 183.

---

[5] Gorsuch predates Chevron but applied a substantially similar level of deference. See 693 F.2d at 181 ("We hold merely that EPA's interpretation is reasonable, not inconsistent with congressional intent, and entitled to great deference; therefore, it must be upheld.").

In doing so, the Gorsuch court accepted the EPA's position that colder water and changes in oxygen and dissolved nutrient content were not pollutants at all. Id. at 174. That rendered irrelevant whether the changed water was being 'added' to navigable water by its movement through a dam. In any event, the water was moving from a river above a dam to the same river below it. Because the facts of the case did not present the issue of whether the transfer of pollutants from one body of water to a different body of water adds pollutants to the navigable waters, the Gorsuch court could not have decided that issue. Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) (same). It follows that the court also could not have decided whether the statutory language was ambiguous regarding that issue, which is the one before us. Language can be ambiguous in some respects but not in others.

The other decision the Water District pitches us is Consumers Power. In that case a power plant sucked water containing some unlucky fish out of Lake Michigan, pumped the water uphill, and then directed it and the fish back downhill through turbines that generated electricity. 862 F.2d at 581. In the process the

20

turbines pureed some of the fish and spewed the fish puree back into Lake Michigan. Id. at 581–82. The plant was a "dam" for permitting purposes because part of the generating process involved impounding water. Id. at 589–90. Deferring to the EPA's position, the Sixth Circuit concluded that "any entrained fish released with the . . . facility's turbine generating water originate in Lake Michigan and do not enter the Lake from the outside world." Id. at 585. Fish, living or dead, are biological material under the Clean Water Act, and the fish in Consumers Power had always existed in the same lake to which the power plant returned them. See id. Accordingly, the court did not have before it, and so could not have decided, whether moving pollutants between different bodies of navigable water constitutes an addition of pollutants to navigable waters. See Watts, 316 F.3d at 1207.

Gorsuch and Consumers Power involved water that wound up where it would have gone anyway. That is not the case here. Water from the agricultural canals would not flow upstream into Lake Okeechobee if the S-2, S-3, and S-4 pumps did not move it there. Here, unlike in Gorsuch and Consumers Power, pollutants are being moved between meaningfully distinct water bodies.[6] The fact that those decisions found the statute ambiguous as applied to different factual

___

[6] See supra note 2.

21

situations is of little help to the Water District.  See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450, 122 S. Ct. 941, 950 (2002) (explaining that the inquiry as to whether a statute is ambiguous is undertaken "with regard to the particular dispute in the case"); United States v. Santos, __ U.S. __, 128 S. Ct. 2020, 2024 (2008) (noting that "context gives meaning" with regard to the circumstances under which a statute is ambiguous).  Context means a lot.

The Friends of the Everglades, arguing against ambiguity, pitch us other decisions.  See, e.g., Catskills I, 273 F.3d at 481; Catskills II, 451 F.3d at 77; Miccosukee, 280 F.3d at 1367, vacated, 541 U.S. at 112, 124 S. Ct. at 1547; Dubois, 102 F.3d at 1273.  They argue that all of the courts of appeals that have addressed the issue have found that "any addition of any pollutant to navigable waters" includes moving polluted water between meaningfully distinct water bodies.  That statement depends, however, on what one means by "the issue." Each decision the Friends of the Everglades rely on addressed which interpretation of the statutory language was most plausible or preferable.  Because they all came out before the EPA's new regulation went into effect, none of those decisions addressed the issue before us, which is whether the EPA's interpretation of the statutory language is reasonable, even if we might prefer another one.  Deciding how best to construe statutory language is not the same thing as deciding whether

a particular construction is within the ballpark of reasonableness.  See Brand X, 545 U.S. at 980, 125 S. Ct. at 2699 ("Chevron requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."); Shotz v. City of Plantation, 344 F.3d 1161, 1178 (11th Cir. 2003) (observing that "in the absence of an administrative interpretation," a court must impose its own construction on the statute).

Still, the Friends of the Everglades urge us to infer from the opinions in those other cases that the courts believed the Act's language unambiguously requires a permit in these circumstances, and they argue that we should be persuaded by that inference.  In the Catskills cases, the Second Circuit held that pumping polluted water from the Schoharie Reservoir into the Esopus Creek required an NPDES permit.  Catskills I, 273 F.3d at 489.  Those water bodies were hydrologically connected; they both flowed into the Hudson River.  But because of directional flow and gravity, waters from the reservoir "under natural conditions . . . would never reach Esopus Creek."  Id. at 484.  The Second Circuit stated that "[n]o one can reasonably argue that the water in the Reservoir and the Esopus are in any sense the 'same.'"  Id. at 492.

23

The Second Circuit then brushed aside the EPA's informal opinion that no permit was required. The court cited the "ordinary meaning" of the statutory text, especially the word "addition," and called the "'singular entity' theory of navigable waters . . . inconsistent with the ordinary meaning of the word 'addition.'" Id. at 493. It concluded that "none of the statute's broad purposes sways us from what we find to be the plain meaning of its text . . . . We find that the textual requirements of the . . . definition of 'discharge of a pollutant' in § 1362(12) are met here." Id. at 494. In Catskills II that court confirmed its holding. In doing so, it found unpersuasive the EPA's 2005 guidance letter, which reiterated the EPA's view that a permit was not required. That letter, the court explained, "simply overlooked [the] plain language [of the statute]." 451 F.3d at 84. The letter was not entitled to, and did not receive, Chevron-level deference. Id. at 82. It only warranted and received Skidmore consideration for persuasive value, which is a significantly less deferential standard. Id.

Importantly, the Second Circuit explicitly refused to foreclose the possibility that its decision might be different if Chevron deference applied. Catskills I, 273 F.3d at 490 ("If the EPA's position had been adopted in a rulemaking or other formal proceeding, deference of the sort applied by the

Gorsuch and Consumers Power courts might be appropriate.").  That is the situation we have here.

Our opinion in Miccosukee followed the same line of reasoning as the Second Circuit in the Catskills cases and reserved the same question, which is the question before us now.  Miccosukee, 280 F.3d at 1367, vacated, 541 U.S. at 112, 124 S. Ct. at 1547.  In Miccosukee we stated our belief that the Clean Water Act required an NPDES permit for transfers of polluted water between meaningfully distinct water bodies, but we qualified that conclusion.  Id. at 1369.  We pointed out that we could "ascertain no EPA position applicable to S-9 to which to give any deference, much less Chevron deference."  Id. at 1368 n.4.  Now there is an EPA regulation that poses the Chevron issue missing from the Miccosukee case.[7]

None of the decisions the parties have thrown our way helps either side much.  The Water District's decisions found ambiguity in the relevant provision of the Clean Water Act as it applied to dams involving the same bodies of water, not to pumps transferring pollutants between meaningfully distinct bodies of water.

---

[7] The Dubois case is similar to Miccosukee and the Catskills cases.  In Dubois the First Circuit held that transferring pollutants from a river to a pond required an NPDES permit because the court wanted to avoid "a watering down of Congress' clear statutory protections." 102 F.3d at 1299.  However, the court did not apply Chevron deference, id. at 1285 n.15, and it does not appear that the Forest Service had promulgated a regulation that the court could have deferred to even if it had desired to do so.  Id. at 1296–99.

25

The Friends of the Everglades' decisions, though involving the same factual context, decided only how best to construe the statutory language—not whether that language is ambiguous and could reasonably be construed another way. We turn to that issue now.

**IV.**

In the first step of <u>Chevron</u> analysis we apply the traditional tools of statutory construction to ascertain whether Congress had a specific intent on the precise question before us. <u>See</u> <u>Chevron</u>, 467 U.S. at 843 n.9, 104 S. Ct. at 2782 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). If Congress did, then the statute is not ambiguous and <u>Chevron</u> has no role to play. The traditional tools of statutory construction include "examination of the text of the statute, its structure, and its stated purpose." <u>Miami-Dade County v. EPA</u>, 529 F.3d 1049, 1063 (11th Cir. 2008); <u>see also</u> <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341, 117 S. Ct. 843, 846 (1997) ("The plainness or ambiguity of statutory language is determined by reference to

the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").[8]

## A.

The Clean Water Act outlaws "the discharge of any pollutant" subject to several exceptions, one of which is where an NPDES permit is obtained. 33 U.S.C. §§ 1311, 1342(a)(1). "Discharge" includes "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Navigable waters," in turn, is defined as "the waters of the United States." 33 U.S.C. § 1362(7). The Supreme Court has recently instructed that the term "discharge of pollutants" and its definition is "of particular significance" within a "complicated statute." S.D. Warren Co., 547 U.S. at 380, 126 S. Ct. at 1850.

The question is whether "addition . . . to navigable waters"—meaning addition to "the waters of the United States"—refers to waters in the individual sense or as one unitary whole. Under the Water District's unitary waters theory, "to navigable waters" means to all navigable waters as a singular whole. As a result, pollutants can be added to navigable waters only once, and pollutants that are already in navigable waters are not added to navigable waters again when

_____

[8] Recently, we reluctantly concluded that in determining for Chevron purposes whether Congress had an intent on the issue at hand, we also look to legislative history. Miccosukee, No. 08-10799, 2009 WL 1199871 at *14. We do that on page 34, infra.

moved between water bodies. Conversely, the Friends of the Everglades' position is that "to navigable waters" refers to each individual water body. As a result, the statute means "any addition of any pollutant to <u>any</u> navigable waters," even though those are not the words the statute uses. Under the Friends of the Everglades' reading, pollutants existing in one navigable water, like the agricultural canals, are "added . . . to navigable waters" when they are transferred into another navigable water, like Lake Okeechobee.

The common meaning of the term "waters" is not helpful. In ordinary usage "waters" can collectively refer to several different bodies of water such as "the waters of the Gulf coast," or can refer to any one body of water such as "the waters of Mobile Bay." An "addition . . . to navigable waters" could encompass any addition to a single body of navigable water regardless of source (like water pumped from one navigable body of water to another), or it could mean only an addition to the total navigable waters from outside of them (like a factory pumping pollutants into a navigable stream). Because the statutory language could be used either way, we turn next to its immediate context.

**B.**

The context in which language is used is important. See <u>Robinson</u>, 519 U.S. at 341, 117 S. Ct. at 846; <u>Koons Buick Pontiac GMC, Inc. v. Nigh</u>, 543 U.S. 50,

28

60, 125 S. Ct. 460, 467 (2004) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because the same terminology is used elsewhere in a context that makes its meaning clear . . . ."); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132, 120 S. Ct. 1291, 1300–01 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."). The Water District argues that the context of 33 U.S.C. § 1362(12) demonstrates that Congress intentionally selected each word in the definition of "discharge" to deliver a specific meaning. It asserts that the Friends of the Everglades' reading of the statute would require us to add words to the law, which is impermissible.

"Discharge" is defined in the Act as "[a]ny addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). According to the Water District, the conspicuous absence of "any" before "navigable waters" in § 1362(12) supports the unitary waters theory because it implies that Congress was not talking about <u>any</u> navigable water, but about <u>all</u> navigable waters as a whole. The Friends of the Everglades' reading effectively asks us to add a fourth "any" to the statute so that it would read: "Any addition of any pollutant to <u>any</u> navigable waters from any point source." But we are not allowed to add or subtract words from a statute; we cannot rewrite it. See 62 Cases, More or Less, Each Containing

29

Six Jars of Jam v. United States, 340 U.S. 593, 596, 71 S. Ct. 515, 518 (1951) (we are not "to add nor to subtract, neither to delete nor to distort [the words]" Congress has used); Blount v. Rizzi, 400 U.S. 410, 419, 91 S. Ct. 423, 429 (1971) ("[I]t is for Congress, not this Court, to rewrite the statute."); Nguyen v. United States, 556 F.3d 1244, 1256 (11th Cir. 2009) ("We are not authorized to rewrite, revise, modify, or amend statutory language in the guise of interpreting it . . . ."); Albritton v. Cagle's, Inc., 508 F.3d 1012, 1017 (11th Cir. 2007) ("We are not empowered to rewrite statutes."). Besides, if the meaning of language is plain, no alteration should be necessary to clarify it. The addition or subtraction of words indicates that the unaltered language is not plain.

There is also the fact that Congress knows how to use the term "any navigable water[s]" when it wants to protect individual water bodies instead of navigable waters as a collective whole. Within the Clean Water Act itself, Congress authorized the EPA to investigate "the pollution of any navigable waters," 33 U.S.C. § 1254(a)(3), and referred to the EPA's dissemination of information about changes in the flow "of any navigable waters." 33 U.S.C. § 1314(f)(2)(F). Other water protection statutes also use the term "any navigable water[s]." See, e.g., 33 U.S.C. § 407 ("It shall not be lawful to throw, discharge, or deposit. . . any refuse matter . . . into any navigable water of the United States. .

30

. .”); 33 U.S.C. § 419 (“The Secretary of the Army is authorized . . . to govern the transportation and dumping into any navigable water, or waters adjacent thereto, of dredgings, earth, garbage, and other refuse materials . . . .”); 33 U.S.C. § 512 (“No bridge shall at any time unreasonably obstruct the free navigation of any navigable waters of the United States.”). The common use by Congress of “any navigable water” or “any navigable waters” when it intends to protect each individual water body supports the conclusion that the use of the unmodified term “navigable waters” in § 1362(12) (or the use in its definition, “the waters of the United States,” at § 1362(7)) means the waters collectively. See Delgado v. U. S. Att’y Gen., 487 F.3d 855, 862 (11th Cir. 2007) (“[W]here Congress knows how to say something but chooses not to, its silence is controlling.” (quotation marks omitted)); DirecTV, Inc. v. Brown, 371 F.3d 814, 818 (11th Cir. 2004) (“[W]hen Congress uses different language in similar sections, it intends different meanings.” (quoting Iraola & CIA, S.A. v. Kimberly-Clark Corp., 232 F.3d 854, 859 (11th Cir. 2000)).

That context does not, however, establish that the meaning of the statutory language is clear. Although Congress did use the term “any navigable waters” in the Clean Water Act to protect individual water bodies, it also used the unmodified “navigable waters” to mean the same thing. For example, as the

31

Supreme Court noted in <u>Miccosukee</u>, 541 U.S. at 107, 124 S. Ct. at 1544, the Act discusses the states' creation of water-body-specific quality standards based on "the designated uses of the navigable waters involved." 33 U.S.C. § 1313(c)(2). In that context "the navigable waters" must refer to many individual water bodies— exactly what the Friends of the Everglades contend that it means in 33 U.S.C. § 1362(12). <u>Id.</u> ("Any addition of any pollutant to navigable waters . . . ."); <u>see also</u> <u>Miccosukee</u>, 541 U.S. at 106–07, 124 S. Ct. at 1544 (citing § 1313(c)(2) and stating that "several NPDES provisions might be read to suggest a view contrary to the unitary waters approach").

The result so far is that we are not persuaded that the meaning of the statutory provision at issue, read either in isolation or in conjunction with similar provisions, is plain one way or the other. The statutory context indicates that sometimes the term "navigable waters" was used in one sense and sometimes in the other sense.

## C.

The "broader context of the statute as a whole" does not resolve the ambiguity. <u>Robinson</u>, 519 U.S. at 341, 117 S. Ct. at 846; <u>see also</u> <u>Koons Buick</u>, 543 U.S. at 60, 125 S. Ct. at 467 (explaining that a seemingly ambiguous provision may be clarified by the broad context of the statute if "only one of the

permissible meanings produces a substantive effect that is compatible with the rest of the law"). The general purpose of the Clean Water Act is broad and ambitious:

> The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter— (1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985. . . .

33 U.S.C. § 1251(a). The NPDES permitting program is the centerpiece of the Clean Water Act. See, e.g., Am. Iron & Steel Inst. v. EPA, 115 F.3d 979, 990 (D.C. Cir. 1997); Gorsuch, 693 F.2d at 175–76 ("There is indeed some basis in the legislative history for the position that Congress viewed the NPDES program as its most effective weapon against pollution."). In light of the sweeping goals of the Act, the Senate Conference Report states that the "conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation . . . ".[9] S. Rep. No. 92-1236 (1972) (Conf. Rep.), reprinted in 1972 U.S.C.C.A.N. 3776, 3822. The Friends of the Everglades argue that, for two reasons, the Clean Water Act's ambitious anti-pollution goals make it absurd to read the Act as

---

[9] That statement appears intended to extend the application of the Clean Water Act to cover as much water as the Commerce Clause would allow. See generally Rapanos v. United States, 547 U.S. 715, 126 S. Ct. 2208 (2006). The question before us is not the constitutional reach of the Act but the meaning of specific statutory language where the Act does apply.

implicitly creating a sizeable exception to the NPDES permitting program for pollutants that come from other navigable waters.

First, they assert that the permitting program itself is designed to protect individual water bodies. State water quality standards, which are specific to individual water bodies, are intertwined with the NPDES permitting process. If a water body fails to meet the state water quality standards, the government alters the terms of the NPDES permits held by contributing point sources in order to ratchet down the load of pollutants that may be pumped into that water body. Miccosukee, 541 U.S. at 107, 124 S. Ct. at 1544; see also 33 U.S.C. § 1313(d). Given the permitting requirement's role in maintaining individualized water quality standards, the Friends of the Everglades argue that it would make little sense to allow uncontrolled, un-permitted pumping between navigable waters that could have different quality standards. Lake Okeechobee, for example, is classified as drinking water under the state water quality standards. Pumping dirty agricultural canal water into the lake makes it more difficult to meet the lake's quality standards. To allow such pumping without a permit tends to undermine the goals of the NPDES program. The Friends of the Everglades argue that the unitary waters theory, which would exclude from the permitting

requirement the pumping of pollutants into the lake, is an unreasonably narrow reading of the Act.

Second, the Friends of the Everglades argue that reading the statute to protect only the navigable waters as one unitary whole could lead to results even more absurd than pumping dirty canal water into a reservoir of drinking water. If an "addition . . . to navigable waters" occurs only at a pollutant's first entry into navigable waters, and not when it is transferred to a different water body, then the NPDES program— the centerpiece of the Clean Water Act— would require no permit to pump the most loathsome navigable water in the country into the most pristine one.

These horrible hypotheticals are frightening enough that we might agree with the Friends of the Everglades that the unitary waters theory does not comport with the broad, general goals of the Clean Water Act. See generally 33 U.S.C. § 1251(a) (stating the Act's goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters"). But we "interpret and apply statutes, not congressional purposes." In re Hedrick, 524 F.3d 1175, 1188 (11th Cir. 2008); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79, 118 S. Ct. 998, 1002 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); Norfolk S. R.

35

Co. v. Sorrell, 549 U.S. 158, 171, 127 S. Ct. 799 (2007) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." (citation omitted)). And there are other provisions of the Clean Water Act that do not comport with its broad purpose of restoring and maintaining the chemical, physical and biological integrity of the Nation's waters. (Which may help explain why the Act's express goal of completely eliminating all discharge of pollutants into the navigable waters by 1985 was not met.)

No one disputes that the NPDES program is restricted to point sources. Non-point source pollution, chiefly runoff, is widely recognized as a serious water quality problem, but the NPDES program does not even address it. See generally Rapanos, 547 U.S. at 777, 126 S. Ct. at 2247 (Kennedy, J., concurring) (observing that agricultural runoff from farms along the Mississippi River creates an annual hypoxic 'dead zone' in the Gulf of Mexico that is nearly the size of New Jersey); Or. Natural Desert Ass'n v. U. S. Forest Serv., 550 F.3d 778, 780 (9th Cir. 2008) (stating that the "disparate treatment of discharges from point sources and nonpoint sources is an organizational paradigm of the [Clean Water] Act"). Not only are ordinary non-point sources outside the NPDES program, but Congress even created a special exception to the definition of "point source" to exclude

agricultural storm water discharges and return flows from irrigation, despite their known, substantially harmful impact on water quality.  33 U.S.C. § 1362(14).

The point is that it may seem inconsistent with the lofty goals of the Clean Water Act to leave out of the permitting process the transfer of pollutants from one navigable body of water to another, but it is no more so than to leave out all non-point sources, allowing agricultural run-offs to create a huge "dead zone" in the Gulf of Mexico.  Yet we know the Act does that.  What this illustrates is that even when the preamble to legislation speaks single-mindedly and espouses lofty goals, the legislative process serves as a melting pot of competing interests and a face-off of battling factions.  What emerges from the conflict to become the enactment is often less pure than the preamble promises.  The provisions of legislation reflect compromises cobbled together by competing political forces and compromise is the enemy of single-mindedness.  It is not difficult to believe that the legislative process resulted in a Clean Water Act that leaves more than one gap in the permitting requirements it enacts.  Wyeth v. Levine, __ U.S. __, 129 S. Ct. 1187, 1215–16 (2009) (Thomas, J., concurring) ("Legislators may compromise on a statute that does not fully address a perceived mischief, accepting half a loaf to facilitate a law's enactment." (quotation omitted)); Bd. of Governors v. Dimension Fin. Corp.,  474 U.S. 361, 373–74, 106 S. Ct. 681, 688–89 (1986) ("Application of

37

'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. . . . [T]he final language of the legislation may reflect hard-fought compromises.").

As the Supreme Court once said, "[a]fter seizing every thing from which aid can be derived we are left with an ambiguous statute." United States v. Bass, 404 U.S. 336, 347, 92 S. Ct. 515, 522 (1971) (internal alteration and citation omitted). There are two reasonable ways to read the § 1361(12) language "any addition of any pollutant to navigable waters from any point source." One is that it means "any addition . . . to [any] navigable waters;" the other is that it means "any addition . . . to navigable waters [as a whole]." As we have held before, "the existence of two reasonable, competing interpretations is the very definition of ambiguity." United States v. Acosta, 363 F.3d 1141, 1155 (11th Cir. 2004) (quotation marks omitted).

**D.**

Having concluded that the statutory language is ambiguous, our final issue is whether the EPA's regulation, which accepts the unitary waters theory that transferring pollutants between navigable waters is not an "addition . . . to navigable waters," is a permissible construction of that language. Chevron, 467

U.S. at 843, 104 S. Ct. at 2782. In making that determination, we "need not conclude that the agency construction was . . . the reading the court would have reached if the question initially had arisen in a judicial proceeding." Id. at 837, 843 n.11, 104 S. Ct. at 2782 n. 11; see also id. at 844, 104 S. Ct. at 2782 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."). Because the EPA's construction is one of the two readings we have found is reasonable, we cannot say that it is "arbitrary, capricious, or manifestly contrary to the statute." Id. at 844, 104 S. Ct. at 2782.

Sometimes it is helpful to strip a legal question of the contentious policy interests attached to it and think about it in the abstract using a hypothetical. Consider the issue this way: Two buckets sit side by side, one with four marbles in it and the other with none. There is a rule prohibiting "any addition of any marbles to buckets by any person." A person comes along, picks up two marbles from the first bucket, and drops them into the second bucket. Has the marble-mover "add[ed] any marbles to buckets"? On one hand, as the Friends of the Everglades might argue, there are now two marbles in a bucket where there were none before, so an addition of marbles has occurred. On the other hand, as the Water District might argue and as the EPA would decide, there were four marbles

39

in buckets before, and there are still four marbles in buckets, so no addition of marbles has occurred. Whatever position we might take if we had to pick one side or the other, we cannot say that either side is unreasonable.

Like the marbles rule, the Clean Water Act's language about "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12), is ambiguous. The EPA's regulation adopting the unitary waters theory is a reasonable, and therefore permissible, construction of the language. Unless and until the EPA rescinds or Congress overrides the regulation, we must give effect to it.

In the defendants' appeal, we REVERSE the district court's judgment that the operation of the S-2, S-3, and S-4 pumps without NPDES permits violates the Clean Water Act. We DISMISS AS MOOT the plaintiffs' cross-appeal from the dismissal of the Water District on Eleventh Amendment grounds.

**REVERSED in part and DISMISSED in part.**