[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-13462
_____

D.C. Docket No. 8:18-bk-04971-MGW

In re: GATEWAY RADIOLOGY CONSULTANTS, P.A.,

Debtor.
_____

USF FEDERAL CREDIT UNION,
JOVITA CARRANZA, in her capacity as Administrator for the U.S. Small
Business Administration,

Appellants,

versus

GATEWAY RADIOLOGY CONSULTANTS, P.A.,

Appellee.

_____

Appeal from the United States Bankruptcy Court
for the Middle District of Florida
_____

(December 22, 2020)

Before ROSENBAUM, ANDERSON, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Gateway Radiology Consultants is a small business debtor in an active Chapter 11 bankruptcy proceeding seeking a loan under the Paycheck Protection Program (PPP).  The problem for Gateway is that the Small Business Administration, which Congress authorized to implement the PPP and to issue regulations on the subject, has issued a rule that makes bankruptcy debtors ineligible for PPP loans.

Gateway applied for a PPP loan anyway.  It would have been turned down but for the fact that the application form it filed falsely stated that it was not in bankruptcy.  Because of that false statement, USF Federal Credit Union agreed to make a PPP loan to Gateway.  But Gateway, like all debtors in bankruptcy, had to get the bankruptcy court's approval before it could incur any more indebtedness outside the ordinary course of business.  When it filed a motion for approval in the bankruptcy court, the SBA objected that Gateway was ineligible for a PPP loan because it was in bankruptcy.

The bankruptcy court granted Gateway's motion anyway.  It concluded that the SBA's rule rendering bankruptcy debtors ineligible for PPP loans was an unreasonable interpretation of the statute, was arbitrary and capricious under the Administrative Procedure Act, and as a result was unlawful and unenforceable

2

against Gateway.  It ordered the SBA not to deny Gateway's loan a guarantee or eligibility for forgiveness based on Gateway being in bankruptcy. Concluding that the SBA's rule is neither an unreasonable interpretation of the relevant statute nor arbitrary and capricious, we vacate the bankruptcy court's approval order.  We also vacate a preliminary injunction order to the same effect that the bankruptcy court entered.

## I.  FACTUAL BACKGROUND

### A.  Statutory Background

In response to COVID-19-induced economic fallout, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, or CARES Act.  See Coronavirus Aid, Relief, and Economic Security Act, Pub L. No. 116-136, 134 Stat. 281 (2020).  The Act is in large part aimed at helping businesses make payroll and pay operating expenses in order to keep people employed through the economic downturn.  One of the Act's programs designed to accomplish that goal, and the one at issue in this appeal, is the PPP. Id. § 1102, 134 Stat. at 286 (codified at 15 U.S.C. § 636(a)(36)).

The PPP is directed at small businesses and its principal function is to provide potentially forgivable loans to them.  See 15 U.S.C. § 636(a)(36)(D)(I).[1]  It

---

[1] The program lasts during a "covered period," which is defined as "beginning on February 15, 2020 and ending on December 31, 2020."  Id. § 636(a)(36)(A)(iii).

is designed to give loans to eligible businesses and, if the loaned funds are used for specified expenses, to allow those loans to be forgiven. See 15 U.S.C. § 9005(b). The recipient can receive loan forgiveness if it uses the funds to cover payroll and certain other expenses like mortgage or rent payments and utility expenses. Id. Generally the amount of the loan that is forgiven is the amount used to pay those costs. Id. But the bulk of the funds, at least 60 percent, must be spent on payroll. Id. § 9005(d)(8).[2]

One might think that the list of allowable uses for PPP loan funds would be the same as the list of uses eligible for loan forgiveness, but one would be wrong. The statutory list of allowable uses of loan funds is longer than the list of uses that qualify for loan forgiveness; all forgivable uses are allowable, but not all allowable uses are forgivable. For example, payments related to health care benefits and interest on debt obligations are allowable uses of loan funds, but the portion of the loan used for those payments will not be forgiven. See id. § 636(a)(36)(F)(i)(I)–(VII); id. § 9005(b).

### B. The Small Business Administration

---

[2] This 60 percent number was added to the PPP in the Paycheck Protection Program Flexibility Act of 2020. See Paycheck Protection Program Flexibility Act of 2020, Pub. L. 116-142, § 3, 134 Stat. 641, 642 (2020). That law superseded an SBA rule requiring at least 75 percent of the loan funds to be used on payroll. See 85 Fed. Reg. 20,811, 20,814 (Apr. 15, 2020).

Because the SBA administers PPP loans and does so under one of the loan programs that was already in place, understanding the SBA's functions and that pre-existing loan program helps put the issues in context.   Since its creation, part of the SBA's purpose has been to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise." See 15 U.S.C. § 631(a).  It has "extraordinarily broad powers to accomplish these important objectives, including that of lending money to small businesses whenever they could not get necessary loans on reasonable terms from private lenders." SBA v. McClellan, 364 U.S. 446, 447 (1960).

Congress has delegated to the SBA a variety of rulemaking and other powers.  It has authorized the SBA to "make such rules and regulations as [it] deems necessary to carry out the authority vested in" it, 15 U.S.C. § 634(b)(6); and to "take any and all actions . . . when [it] determines such actions are necessary or desirable in making . . . or otherwise dealing with or realizing on loans," id. § 634(b)(7); and to "establish general policies . . . which shall govern the granting and denial of applications for financial assistance by the [SBA]," id. § 633(d).

The SBA aids small businesses primarily through financing private loans. Typically it "prefers to guarantee private loans rather than to disburse funds directly." United States v. Kimbell Foods, Inc., 440 U.S. 715, 719 n.3 (1979).

5

And most often it operates under 15 U.S.C. § 636(a) through what are called "section 7(a) loans."

Section 7(a) loans are subject to certain eligibility requirements. One is that an applicant must be a "small business concern," and the SBA is authorized to "specify detailed definitions or standards by which a business concern may be determined to be a small business concern." 15 U.S.C. § 632(a)(2)(A). It has done so. For example, the SBA has specified in a regulation that to qualify as a small business concern an entity must be an operating business organized for profit, located in the United States, and that it must fit within detailed size requirements that vary by industry. 13 C.F.R. § 120.100(a)–(e); see also id. § 121.201. In addition, it must be shown that the applicant cannot get credit elsewhere: "that the desired credit is unavailable to the applicant on reasonable terms and conditions" without SBA assistance. 13 C.F.R. § 120.101; see also 15 U.S.C. § 632(h); id. § 636(a)(1)(A)(i) ("No financial assistance shall be extended pursuant to this subsection if the applicant can obtain credit elsewhere.").

Section 7(a) loans are also, by statute, subject to a "sound value" requirement: "all loans made under [§ 7(a)] shall be of such sound value or so secured as reasonably to assure repayment[.]" 15 U.S.C. § 636(a)(6). In obedience to that statutory mandate, the SBA has long included a creditworthiness requirement in its lending criteria. Those criteria require that a loan applicant

6

"must be creditworthy" and that "[l]oans must be so sound as to reasonably assure repayment." 13 C.F.R. § 120.150. The soundness and repayment criteria include nine factors that the "SBA will consider," including the "[c]haracter, reputation, and credit history of the applicant," the "[s]trength of the business," and the "[a]bility to repay the loan with earnings from the business." Id. § 120.150(a)–(i).

Consistent with the soundness and repayment criteria, the SBA considers an applicant's bankruptcy status or history. The SBA's official § 7(a) loan application form, which is part of its loan program requirements, see 13 C.F.R. § 120.10, asks applicants if they have ever filed for bankruptcy, see SBA Form 1919. And its guidance to lenders requires that for "7(a) loans greater than $350,000 and loans of $350,000 or less that do not meet [the] SBA's minimum credit score requirements for 7(a) Small Loans," the lender's "credit memorandum" recommending approval "must address the Applicant's ability and likelihood to repay the loan from [its] cash flow." See SBA, Standard Operating Procedure, § 50 10 5(K), Lender and Development Company Loan Programs 178 (Apr. 1, 2019). And that part of the credit memorandum must disclose any bankruptcy filings, although they will not automatically render the applicant ineligible for a § 7(a) loan. Id. at 180.

Section 7(a) matters to this case because the PPP was not created as a standalone program; instead it was added into § 7(a), albeit with several of that subsection's general eligibility requirements relaxed. See CARES Act, § 1102,

7

134 Stat. at 286 (amending § 7(a)); see also 15 U.S.C. § 636(a)(36)(B) ("[T]he Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection [§ 7(a)]."). For example, in the context of the PPP, the CARES Act relaxes (or expands) the typical § 7(a) definition of businesses that are eligible for a loan. See 15 U.S.C. § 636(a)(36)(D). That subsection is titled, "Increased eligibility for certain small businesses and organizations," and it states: "In general[:] During the covered period, in addition to small business concerns, any business concern . . . shall be eligible to receive a covered loan if the business concern . . . employs not more than the greater of . . . 500 employees; or . . . if applicable, the size standard in number of employees established by the [SBA] for the industry in which the business concern . . . operates." Id. § 636(a)(36)(D)(i)(I). The CARES Act also relaxes eligibility requirements for PPP loans by exempting them from the § 7(a) requirement that the applicant be unable to obtain credit elsewhere. See id. § 636(a)(36)(I).

What the CARES Act did not do for PPP loans is also significant. It did not exempt them from the § 7(a) sound value requirement.

In the CARES Act, Congress gave the SBA rulemaking power directly related to the PPP, specifying that it "shall issue regulations to carry out this title." CARES Act, § 1114, 134 Stat. at 312 (codified at 15 U.S.C. § 9012). And

8

Congress ordered that it be done posthaste, requiring that the implementing regulations be issued "[n]ot later than 15 days after the date of enactment of this Act." Id. Recognizing the rulemaking deadline would otherwise be impossible, Congress freed the SBA from having to comply with the notice requirement that is a familiar part of the rulemaking process. See id. (directing that the regulations shall be issued "without regard to the notice requirements under [5 U.S.C. § 553(b)]").

### C. SBA Rules Implementing the PPP

Acting on the statutory mandate, the SBA issued several rules implementing the PPP. Two of them are relevant here: the SBA's first interim final rule and its fourth interim final rule. The first one stated that the normal § 7(a) lending criteria in 13 C.F.R. § 120.150 did not apply to PPP loans and established streamlined and more lenient underwriting requirements. 85 Fed. Reg. 20,811, 20,812, 20,815 (Apr. 15, 2020). In addition, it allowed lenders to rely on the borrower's certifications and assured them that the SBA would hold lenders harmless for any borrower error or misrepresentation. Id. at 20,812, 20,816.

The first interim final rule also addressed borrower eligibility for PPP loans. Id. at 20,812–15. It did not specify that all bankruptcy debtors are ineligible, but it did state that applicants are required to submit SBA Form 2483, which is the PPP application form. Id. at 20,814. The very first question on that form asks whether

the applicant is "presently involved in any active bankruptcy." See SBA Form 2483. The form also states unequivocally that if the answer is "yes" the loan will not be approved. See id.

The SBA's fourth interim final rule does explicitly provide that bankruptcy debtors are ineligible for the PPP. 85 Fed. Reg. 23,450, 23,451 (Apr. 28, 2020).[3] It states that: "If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan." Id. The rule explains why bankruptcy debtors are ineligible: "The Administrator, in consultation with the Secretary, determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans." Id. It adds that "the Bankruptcy Code does not require any person to make a loan or a financial accommodation to a debtor in bankruptcy." Id. And it points out that SBA Form 2483, "which reflects this restriction [on bankruptcy debtors] in the form of a borrower certification, is a loan program requirement." Id.

With that statutory and regulatory background in mind, we turn to the facts of this case.

---

[3] That rule "supplement[ed] previous regulations and guidance on several important, discrete issues." 85 Fed. Reg. 23,450, 23,450 (Apr. 28, 2020).

10

D.  The Approval of Gateway, a Bankruptcy Debtor, for a PPP Loan

Gateway is a Chapter 11 bankruptcy debtor and has been since May 2019. On April 27, 2020, it applied online to USF Federal Credit Union for a $527,710.00 PPP loan.  Seven days later, USF provided Gateway with a Form 2483 loan application to electronically sign, which Gateway did.  That form was part of Gateway's online application for a PPP loan.  As we've mentioned, the first question on the form asked whether Gateway was "presently involved in any bankruptcy."  Next to that question was a box to check "yes" and a box to check "no."  A straightforward request for a straightforward answer.

The answer that ended up on the form was straightforward but not straight. The "no" box was checked.  USF approved Gateway for the loan because of that answer.  It would not have done so otherwise.  How it came to be that the "no" box was checked instead of the "yes" box is disputed.  Big time.  USF says that Gateway did it.  Gateway says that it actually checked the "yes" box and sent the application form to USF, which had some problem transmitting the form to the SBA, and by the time the form fog had cleared, "yes" had somehow become "no." It was, Gateway says, "some sort of technical error."  USF conducted an internal audit which, it says, proves that Gateway alone is responsible.  It is adamant that Gateway itself marked "no" on the form at the beginning, and the answer was never changed.  The bankruptcy court did not resolve that dispute, apparently

11

because it believed that whether Gateway deliberately lied on the form is irrelevant.

And maybe it is. Regardless of the who, how, or why of the matter, it is undisputed that USF approved a $527,710 PPP loan thinking that Gateway was not in bankruptcy. And USF would not have approved the loan had it known that Gateway was in bankruptcy, which rendered Gateway ineligible for a PPP loan. As things stand today, USF, using its own funds, has funded the loan, but frozen the proceeds and declined to disburse them to Gateway.[4]

## II. PROCEDURAL HISTORY

Because Gateway was a bankruptcy debtor when it applied and was approved for the PPP loan, it was required under 11 U.S.C. § 364(b) to get the bankruptcy court's approval to take on the debt. So it filed with the bankruptcy court an "Emergency Motion to Borrow PPP Loan." That was on May 19, 2020, after Gateway had applied for the PPP loan and been approved by the lender based on the false answer to the first question on its application form.

In response to that approval motion, the SBA filed a limited objection. Though it had "no objection to [Gateway] obtaining post-petition financing" or to the bankruptcy court entering "a narrowly tailored order generally authorizing [Gateway] to apply for such post-petition financing," it did object to Gateway's

---

[4] The bankruptcy court stayed its approval order pending the outcome of this appeal.

12

motion "insofar as it seeks an Order that [Gateway] is eligible to participate in the PPP, entitled to loan forgiveness, or that SBA must guarantee [Gateway's] loan."

In response to that objection, Gateway filed an adversary proceeding in the bankruptcy court naming as defendants the SBA and USF, among others. Realizing that the chances of the SBA agreeing that it was eligible to participate in the PPP were nil, Gateway asked the bankruptcy court for more than permission to get the loan if it could. Gateway asked the court to issue an order requiring the SBA to approve the PPP loan, guarantee it, and forgive the expenditures of the funds. In other words, Gateway wanted the court to order the SBA to treat it as though the false answer to the first question on its application form had been true: to make the SBA treat Gateway as though it were not in bankruptcy.

To that end, Gateway's complaint in the adversary proceeding sought declaratory and injunctive relief. It asked the bankruptcy court to declare that the SBA's rule could not be enforced against Gateway, to order USF to release the funds, and to order the SBA to guarantee and forgive the loan just as it would a PPP loan to a non-bankrupt small business. The complaint claimed that the SBA's non-bankruptcy eligibility rule was unlawful for three reasons: the SBA had exceeded its statutory authority; it had acted arbitrarily and capriciously; and the rule unlawfully discriminated against bankruptcy debtors.

13

The bankruptcy court ruled in Gateway's favor, issuing a memorandum opinion and two orders. The memorandum opinion concluded that injunctive relief was available against the SBA, that the non-bankruptcy eligibility rule was unlawful under the Administrative Procedure Act because the SBA exceeded its authority in adopting the rule and the rule was arbitrary and capricious. The opinion's conclusion that the rule exceeded the SBA's authority was based on its belief that the rule conflicted with the text and purpose of the CARES Act, which had not expressly made bankruptcy debtors ineligible. And, the opinion added, even if the SBA had not exceeded its authority, it had acted arbitrarily and capriciously. The SBA had done so, the opinion stated, because it had improperly considered the factor of collectability, which Congress did not intend it to consider; it had failed to consider the protections the bankruptcy process would afford a PPP loan; and its explanation ran counter to "evidence" that bankruptcy debtors would use the loan funds for permissible purposes and would pose a low risk of non-repayment of unforgiven amounts. (No actual evidence was submitted in the bankruptcy court about the protections afforded by the bankruptcy process. The "evidence" the bankruptcy court referred to apparently was its own views and knowledge of the bankruptcy process.) The court decided to "enjoin the SBA Administrator from enforcing the [non-bankruptcy eligibility] Rule to the extent it

14

disqualifies Gateway Radiology from participating in the Paycheck Protection Program."

About two weeks after issuing that opinion, the bankruptcy court entered in the adversary proceeding an "Order Granting Preliminary Injunction." The preliminary injunction order stated that the eligibility rule "is unenforceable to the extent it disqualifies Gateway Radiology from participating in the Paycheck Protection Program." And it ordered that: if Gateway's "loan meets all the requirements of the Paycheck Protection Program (other than Gateway Radiology not being in bankruptcy), the SBA shall guarantee the loan. And the SBA shall not condition loan forgiveness on Gateway Radiology not being in bankruptcy."

In the main bankruptcy proceeding, the court issued an order approving Gateway's 11 U.S.C. § 364 motion to borrow PPP funds. That order stated that "[b]ecause the Court has determined the [non-bankruptcy eligibility] Rule is unenforceable to the extent it disqualifies the Debtor from participating in the Paycheck Protection Program," it was overruling the SBA's limited objections to Gateway's approval motion. Then, in substantively the same terms as its preliminary injunction order, the court ordered: "So long as the Debtor meets all the requirements of the Paycheck Protection Program (other than the Debtor not being in bankruptcy), the PPP Loan shall be eligible for loan forgiveness and the

15

SBA guarantee.  Neither loan forgiveness nor the SBA guarantee shall be conditioned on the Debtor not being in bankruptcy."

Acting under 28 U.S.C. § 158(d)(2), the bankruptcy court certified a direct appeal to this Court of its approval and preliminary injunction orders.  Gateway and USF each separately petitioned us for permission to directly appeal the bankruptcy court's memorandum opinion, preliminary injunction order, and approval order.  We granted USF's petition.[5]

### III.  JURISDICTION

We need to address our jurisdiction over the appeal of the memorandum opinion, the approval order, and the preliminary injunction order.  We do not have a smidgen of appellate jurisdiction over the memorandum opinion because appellate courts sit to "review[] judgments, not opinions."  See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984); see also United States v. Rivera, 613 F.3d 1046, 1051 (11th Cir. 2010) ("A bedrock principle upon which our appellate review has relied is that the appeal is not from the opinion of the district court but from its judgment.") (quotations marks omitted).

---

[5] The SBA did not file a petition for permission to appeal, but it did file a notice of appeal, which we construed as a petition for permission and effectively granted when we granted the SBA's later motion to amend the caption of the appeal to reflect that the SBA is an appellant.

We do have jurisdiction to review the approval order because Gateway's § 364 motion for approval to borrow money under the PPP was a core matter under 28 U.S.C. § 157(b)(2)(A). And "[i]f a matter is a core proceeding (i.e., the sort of case that arises only in the bankruptcy context or involves rights created by federal bankruptcy law), then the bankruptcy court can enter final judgment [even] absent consent by the parties." Wortley v. Bakst, 844 F.3d 1313, 1318 (11th Cir. 2017); see also 28 U.S.C. § 157(b). The bankruptcy court did enter a final order granting the motion for approval to borrow, and we have jurisdiction over it because it was certified for appeal to us under 28 U.S.C. § 158(d)(2).

Whether we have jurisdiction to review the bankruptcy court's preliminary injunction order, also certified to us under § 158(d)(2), is a more complicated question. Unlike the approval order, the order granting a preliminary injunction to prevent the SBA from enforcing its non-bankruptcy eligibility rule against Gateway came from a non-core proceeding.[6] And bankruptcy courts generally cannot enter a final order, which is the kind of order we can review directly, in non-core proceedings. But there is an exception that arguably fits here. In the Stern case the Supreme Court held that Article III prevents bankruptcy courts from entering final orders about non-core matters unless those matters need to

---

[6] Interlocutory orders of district courts relating to injunctions are appealable to courts of appeal under 28 U.S.C. § 1292(a)(1), but that provision does not cover injunction orders of bankruptcy courts.

"necessarily be resolved" in the course of deciding a core matter. Stern v. Marshall, 564 U.S. 462, 499 (2011). If they do, the bankruptcy court can enter a final order on the non-core matter. See id. at 497–99, 503.

In the Stern case a creditor filed a complaint and proof of claim in the bankruptcy court alleging that the debtor owed him damages for defamation (a core matter), and the debtor responded with a counterclaim for tortious interference (a non-core matter). Id. at 470. The Supreme Court held that the bankruptcy court lacked jurisdiction to enter final judgment on that non-core counterclaim because it would not "necessarily be resolved" by a ruling on the core claim. Id. at 499, 503. Although there was "some overlap" between the creditor's proof of the core claim for defamation and the debtor's proof of the non-core counterclaim for tortious interference, there was not enough; the tortious interference counterclaim did not have to be decided to resolve the defamation claim. Id. at 497–98.

This case is different from Stern. As we have stated, Gateway's § 364 motion for approval to borrow money under the PPP was a core matter under § 157(b)(2)(A). That motion was entirely dependent upon the court concluding that the SBA's rule rendering those in bankruptcy ineligible for PPP loans was invalid. Gateway's motion makes that clear. It was titled "Emergency Motion to Borrow PPP Loan." It did not seek the approval of the bankruptcy court to borrow money generally and regardless of wherever it could find an available source of

18

funds.  The first paragraph of the motion was a "Statement of Exigent

Circumstances," which stated:

> Debtor has requested that USF Federal Credit Union (the "Credit
> Union") extend a $527,710.00 loan to Borrower (the "Loan") to be
> provided in accordance with Section 1102 (creating the "Paycheck
> Protection Program," within the U.S. Small Business Administration's
> ("SBA's") 7(a) Loan Program) and Section 1106 (providing for
> forgiveness of up to the full principal amount of qualifying loans
> guaranteed under the Paycheck Protection Program) of the Coronavirus
> Aid, Relief, and Economic Security Act (the "Act").

The second paragraph of that introductory statement of the approval motion

stated that "[w]ithout the immediate authorization to use the proceeds of a PPP

loan," Gateway would not be able to meet its current obligations or continue day-

to-day operations.  The body of the motion reiterated in virtually every paragraph

that the only loan for which Gateway sought approval was the $527,710 PPP loan.

Attached as Exhibit A to the approval motion was an SBA form note for a PPP

loan in that amount.  Paragraph 4 H of that document made clear that if the

borrower "[b]ecomes the subject of a proceeding under any bankruptcy or

insolvency law," the borrower would be in default under the note.

The approval motion was pointless and futile so long as the SBA was

allowed to enforce its non-bankruptcy eligibility rule.  Bankruptcy courts, no less

than any other federal courts, are not authorized to render advisory opinions or

issue orders that make no difference to anyone.  Only if the SBA were enjoined

from enforcing that rule against Gateway would there be any reason to grant the

19

approval motion. And only if the SBA's rule is invalid or unlawful could the SBA be enjoined not to enforce that rule.

Unlike Stern, in this case the decision of the core and non-core issues both turn on the same question: whether the SBA's non-bankruptcy eligibility rule is invalid. The injunction issue was, as a practical matter, subsumed in the approval order. See Waldman v. Stone, 698 F.3d 910, 920–21 (6th Cir. 2012) (holding that the bankruptcy court's order on a disallowance claim was final under Stern because it was "practically subsumed" within the core matter). The non-core matter was inseparably related to the core matter. In re Frazin, 732 F.3d 313, 321–22 (5th Cir. 2013) (holding that the bankruptcy court's order on a malpractice claim was final under Stern because it was "inseparably related" to the core matter) (quotation marks omitted).

To grant the motion approving the PPP loan for Gateway, the bankruptcy court had to rule, as it did, that the SBA rule is invalid. The court ruled that the SBA had exceeded its authority and acted arbitrarily and capriciously in adopting the rule, and it issued the approval order "[b]ecause the Court has determined the [non-bankruptcy eligibility] Rule is unenforceable." That decision in the core matter proceeding compelled the conclusion in the non-core proceeding, which was to grant Gateway's motion for a preliminary injunction forbidding the SBA to enforce the rule. The approval order decreed that: "So long as the Debtor meets all

the requirements of the Paycheck Protection Program (other than the Debtor not being in bankruptcy), the PPP Loan shall be eligible for loan forgiveness and the SBA guarantee. Neither loan forgiveness nor the SBA guarantee shall be conditioned on the Debtor not being in bankruptcy." The order granting the preliminary injunction likewise concluded that the SBA rule was "unenforceable to the extent it disqualifies Gateway Radiology from participating in the Paycheck Protection Program." It enjoined the SBA to guarantee the PPP loan if Gateway met all of the requirements other than not being in bankruptcy, and enjoined it to "not condition loan forgiveness on Gateway Radiology not being in bankruptcy."

There are four factors that must be considered before a court decides whether to enter a preliminary injunction. Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (stating that a court may grant a preliminary injunction "only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest"). If there is no substantial likelihood of success on the merits, no injunction may be issued. See Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001) ("[O]ur cases have uniformly required a finding of substantial likelihood of success on the merits before injunctive relief may be

21

provided."); <u>Bloedorn v. Grube</u>, 631 F.3d 1218, 1229 (11th Cir. 2011) (stating that if the moving party "is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements"); <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1342 (11th Cir. 1994) ("Because we conclude that the plaintiffs failed to establish a substantial likelihood of success on the merits, we will not address the three other prerequisites of preliminary injunctive relief."). And obviously, if a claim is meritorious, there is even more than a substantial likelihood of success on the merits; if a claim is not meritorious, there is no likelihood of success on the merits.

In these circumstances, the approval order and the preliminary injunction were not separate; they were joined at the hip. They depended on each other. One would have done Gateway no good without the other. They were, in the words of the <u>In re Frazin</u> decision, "inseparably related." 732 F.3d at 321 (quotation marks omitted). As a result, the bankruptcy court's preliminary injunction is no less a final order in the <u>Stern</u> sense than the approval order, and we have appellate jurisdiction over it.

## IV. THE SBA DID NOT EXCEED ITS AUTHORITY

The Administrative Procedure Act requires that we "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or

22

limitations." 5 U.S.C. § 706(2)(C).[7] We typically apply the two-step Chevron framework to determine whether an agency exceeded its statutory authority. Animal Legal Def. Fund v. USDA, 789 F.3d 1206, 1215 (11th Cir. 2015) (citing Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984)).[8]

The first Chevron step is to use all the ordinary tools of statutory construction to determine "whether Congress has directly spoken to the question at issue." Id. We must "ascertain whether Congress had a specific intent on the

---

[7] We note that the injunctive relief Gateway requested and the bankruptcy court granted may be barred by sovereign immunity. See 15 U.S.C. § 634(b)(1) (providing that the SBA Administrator may "sue and be sued . . . but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property"); Romeo v. United States, 462 F.2d 1036, 1037–38 (5th Cir. 1972); In re Hidalgo Cnty. Emergency Servs. Found., 962 F.3d 838, 840–41 (5th Cir. 2020). Gateway contends that injunctive relief is available when the SBA has exceeded its authority. The SBA asserts sovereign immunity but only as a backup position; its principal argument is that it is entitled to a judgment on the merits. Because we hold for the SBA on the merits, we need not and do not reach the sovereign immunity issue. Cf. Silberman v. Miami Dade Transit, 927 F.3d 1123, 1137 (11th Cir. 2019) ("Because sovereign immunity can be waived, our precedent allows us to 'bypass' the threshold question whether an entity is entitled to sovereign immunity where it only conditionally asserts the defense.") (alterations adopted and quotation marks omitted).

[8] The Chevron analysis applies because Congress delegated authority to the SBA to make rules carrying the force of law and the SBA exercised that authority in issuing the eligibility rule. See United States v. Mead Corp., 533 U.S. 218, 229–30 (2001).

Contrary to the bankruptcy court's conclusion, this case does not fall outside of the Chevron framework based on the "major questions" doctrine as articulated by King v. Burwell, 576 U.S. 473, 485–86 (2015). King, which addressed aspects of the Affordable Care Act that "affect[ed] the price of health insurance for millions of people," was one of those "extraordinary cases" where the issue was of such "deep economic and political significance that is central to this statutory scheme" that there was "reason to hesitate before concluding that Congress ha[d] intended such an implicit delegation," especially to an agency with no relevant expertise on the question. Id. (quotation marks omitted). King is inapplicable here. The bankruptcy debtor eligibility question is not of the same "deep economic and political significance" as the issue in King was, nor is it "central to [the CARES Act] statutory scheme." Id. at 486. And it is squarely within, instead of outside, the SBA's expertise.

23

precise question before us." Friends of the Everglades v. S. Fla. Water Mgmt.

Dist., 570 F.3d 1210, 1223 (11th Cir. 2009). In applying the tools of construction,

we focus on "the text of the statute, its structure, and its stated purpose." Id.

(quotation marks omitted). "If the intent of Congress is clear, that is the end of the

matter," and both we and the agency must give effect to that clear intent. Animal

Legal, 789 F.3d at 1215 (quotation marks omitted). If, however, the statute is

ambiguous on the point, we assume that Congress delegated to the agency the

authority to reasonably answer the question. See Chevron, 467 U.S. at 844.

The second Chevron step is to determine if the agency's interpretation of the

statute is reasonable. See Friends of the Everglades, 570 F.3d at 1227–28. "An

interpretation is reasonable if it is rational and consistent with the statute."

Regions Bank v. Legal Outsource PA, 936 F.3d 1184, 1190 (11th Cir. 2019)

(quotations marks omitted). We "'may not substitute [our] own construction of a

statutory provision for a reasonable interpretation made by the administrator of an

agency.'" Friends of the Everglades, 570 F.3d at 1219 (quoting Chevron, 467 U.S.

at 844) (alteration adopted). Chevron requires a federal court to accept the

agency's reasonable interpretation of the statute, "even if the agency's reading

differs from what the court believes is the best statutory interpretation." Id. at

1221 (quotation marks omitted). When Congress intends to accommodate

competing interests but does not do so with enough specificity in the statute, we

24

will defer to an agency's "interpretation [that] represents a reasonable accommodation of manifestly competing interests." Chevron, 467 U.S. at 865.

## A.  Step One

Starting with step one, we ask "whether Congress has directly spoken to the question at issue," Animal Legal, 789 F.3d at 1215, which is whether bankruptcy debtors are eligible for PPP loans — whether they are what the statute calls "eligible recipients," see 15 U.S.C. § 636(a)(36)(A)(iv) (defining "eligible recipient" as "an individual or entity that is eligible to receive a covered loan"). The short answer is that Congress has not spoken directly to the question at issue, and there is good reason to think it intended to delegate authority to the SBA to answer that question.

### 1.  Indications That Congress Delegated the Authority

As we've pointed out, the PPP was not created as a standalone program but was added into the existing § 7(a) program, which subjects it to existing conditions and regulations, as well as existing SBA authority. See CARES Act, § 1102, 134 Stat. at 286 (noting that "Section 7(a) of the Small Business Act (15 U.S.C. 636(a)) is amended" to add the PPP). "[W]e presume that Congress is aware of existing law when it passes legislation." Mississippi ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 169 (2014) (quotation marks omitted). The placement of the PPP in § 7(a) of the Small Business Act, which is titled "Business loans," subjects PPP

25

loans to § 7(a)'s sound value requirement.  See 15 U.S.C. § 636(a)(6) ("All loans made under [§ 7(a)] shall be of such sound value or so secured as reasonably to assure repayment.") (emphasis added).

That conclusion is even more obvious when the text of the CARES Act is considered in context.  See, e.g., Wachovia Bank, N.A. v. United States, 455 F.3d 1261, 1267 (11th Cir. 2006) (explaining that we consider words and provisions of a statute in the context of the overall statutory scheme because "context is king").  Parts of the Act specifically waive or relax some existing § 7(a) requirements, while leaving the sound value one intact.  See, e.g., 15 U.S.C. § 636(a)(36)(D) (relaxing the size requirement); id. § 636(a)(36)(I) (waiving the requirement that the applicant be unable to obtain credit elsewhere).  Congress knew how to suspend or render inapplicable to PPP loans the traditional § 7(a) requirements when it wanted to do so, and it did that with some of the requirements.  But not the sound value requirement.

We recognize that some parts of the CARES Act may result in the sound value requirement having less effect on PPP loans than on other § 7(a) loans.  See 15 U.S.C. § 636(a)(36)(F)(i)(VII) (allowing PPP loan proceeds to be used for "interest on any other debt obligations that were incurred before the covered period"); id. § 636(a)(36)(F)(v) (stating that the SBA "shall have no recourse"

26

except for uses of "the covered loan proceeds for a purpose not authorized").  But Congress didn't do away with the sound value requirement for § 7(a) loans, including PPP loans.  See id. § 636(a)(6) ("All loans made under [§ 7(a)] shall be of such sound value or so secured as reasonably to assure repayment.") (emphasis added).  Any tension between the more lenient aspects of the CARES Act and the existing § 7(a) sound value requirement is evidence of Congress identifying the kind of "manifestly competing interests" that it wanted accommodated but leaving the task of doing so to the SBA.  See Chevron, 467 U.S. at 865.  That's a classic Chevron scenario.

That Congress gave the SBA discretion over the matter is also evidenced by the fact that the Act does not limit the SBA's longstanding general authority to implement § 7(a) and the sound value requirement.  Quite the opposite.  The Act expressly gives the SBA "[e]mergency rulemaking authority" to "issue regulations" carrying out the PPP.  15 U.S.C. § 9012.  And it provides that the SBA "may guarantee covered loans under the same terms, conditions, and processes" as § 7(a).  Id. § 636(a)(36)(B) (emphasis added).  The use of the permissive word "may" vests the SBA with discretionary authority.  See, e.g., Kingdomware Tech., Inc. v. United States, 136 S. Ct. 1969, 1977 (2016).

Those considerations — placing PPP within § 7(a), specifically changing some § 7(a) requirements but not the sound value one, and delegating general

27

rulemaking authority — all show that Congress left it up to the SBA to determine how to apply the sound value requirement to PPP loans, and that includes specifying eligibility requirements. There is an at least implicit delegation of authority for the SBA to do so. And Chevron recognizes implicit delegations of authority. See Chevron, 467 U.S. at 844 ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit."); King, 576 U.S. at 485 (explaining that the Chevron two-step "approach 'is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps'") (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000)); see also Miami-Dade Cnty. v. EPA, 529 F.3d 1049, 1062 (11th Cir. 2008) ("[W]e recognize that when an agency is charged with administering a statute, part of the authority it receives is the power to give reasonable content to the statute's textual ambiguities — in other words, the authority to fill gaps.") (quotation marks omitted); Buckner v. Fla. Habilitation Network, Inc., 489 F.3d 1151, 1155 (11th Cir. 2007) ("Although a delegation of authority from Congress to an agency may be explicit, the Supreme Court has also recognized that such delegations may be implicit.") (quotation marks omitted); Gonzalez v. Reno, 212 F.3d 1338, 1349 n.11 (11th Cir. 2000) ("Where Congress has committed the enforcement of a statute to a particular executive agency,

28

Congress has sufficiently indicated its intent that statutory gaps be filled by the executive agency.").

## 2. Other CARES Act Provisions

Gateway points to several provisions of the CARES Act that it argues overcome the indications that Congress delegated authority to the SBA over PPP eligibility requirements. The thrust of the argument is that because the Act defines some PPP eligibility requirements, those must be the only ones that can be applied. And because those requirements do not exclude bankruptcy debtors, it follows that they cannot be excluded. While the Act does set some eligibility requirements for PPP loans, it doesn't follow that those are the only requirements that can be applied. To show why, we address each of the provisions or aspects of the Act that Gateway relies on.

First, as we have noted, the CARES Act relaxes and simplifies the usual § 7(a) size requirements, which are regulated in detail by the SBA. See 15 U.S.C. § 636(a)(36)(D)(i); 13 C.F.R. § 121.201. And in doing so the Act provides that "any business concern . . . shall be eligible" for a PPP loan if it "employs not more than the greater of . . . 500 employees; or . . . if applicable, the size standard in number of employees established by" the SBA for that business concern's industry. 15 U.S.C. § 636(a)(36)(D)(i)(I)–(II). Of course, "any" typically has an

29

expansive meaning, see Jones v. Waffle House, Inc., 866 F.3d 1257, 1267 (11th Cir. 2017), and "shall" is an imperative, see Kingdomware, 136 S. Ct. at 1977.

But it would be illogical to conclude that this subsection of the CARES Act sets size as the one and only requirement for PPP eligibility. It would be illogical because other sections of the CARES Act waive or relax for PPP loans other § 7(a) eligibility requirements. See 15 U.S.C. § 636(a)(36)(I) (waiving the requirement that the applicant be unable to obtain credit elsewhere). If the sole eligibility requirement were size, then those other provisions would be pointless. We try hard not to interpret statutory provisions in a way that will result in them having no purpose or effect. Corley v. United States, 556 U.S. 303, 314 (2009). And there is a more reasonable and obvious reading of the revision of § 7(a) size requirements for PPP loan purposes. That revision simplifies the detailed and cumbersome size requirements set forth in 13 C.F.R. § 121.201 by focusing only on the number of employees, and it relaxes the size requirement for businesses in many industries. It does not prohibit the SBA from establishing other, non-size related eligibility criteria.

Second, Gateway relies on a subsection of the CARES Act that delegates authority to lenders to make PPP loans and requires them to take into account two "considerations" when "evaluating the eligibility of a borrower." See 15 U.S.C. § 636(a)(36)(F)(ii)(II). One is whether the borrower "was in operation on February

30

15, 2020," and the other is whether it "had employees for whom the borrower paid salaries and payroll taxes" or "paid independent contractors, as reported on a Form 1099-MISC." Id.  But that provision does not say those two considerations are the only ones.  And for reasons we've discussed, it would make little sense if they were the only considerations or criteria for determining eligibility.  The Act establishes some eligibility requirements, the size requirement, for example.  See id. § 636(a)(36)(D)(i).  And it waives some generally applicable § 7(a) requirements, such as the inability to obtain credit elsewhere.  See id. § 636(a)(36)(I).  It would render parts of the Act inoperative and superfluous if the two "considerations" were interpreted as the only ones.  See Corley, 556 U.S. at 314.

Third, Gateway points to a part of the Act that addresses "[b]orrower requirements."  See 15 U.S.C. § 636(a)(36)(G).  That section requires "[a]n eligible recipient applying for a covered loan" to make four certifications.  Id. § 636(a)(36)(G)(i) (emphasis added).  Those four certifications are that: uncertain economic conditions make the loan necessary to support the eligible recipient's ongoing operations; the funds will be used for retaining workers and making payments toward payroll, mortgages, leases, and utilities; the eligible recipient doesn't have other pending PPP loan applications that are duplicative; and the

31

eligible recipient has not received PPP loans that are duplicative.  Id.
§ 636(a)(36)(G)(i)(I)–(IV).

Not only does that list of certifications not purport to be exclusive or
exhaustive, it is not clear that they are eligibility requirements at all.  The text and
structure of the statute distinguish "certifications" from discussions of "eligibility."
See McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc., 851 F.3d 1076, 1089
(11th Cir. 2017) (en banc) ("When Congress uses different language in similar
sections, we should give those words different meanings.") (quotation marks
omitted).  The text of the subsection itself presumes that an "eligible recipient" is
making the certifications.  See 15 U.S.C. § 636(a)(36)(G)(i).  That language
indicates that the eligibility determination is a separate question from whether the
applicant makes the certifications.

The certifications deal with the why, how, and what of the borrower's use of
the funds, not with its general eligibility to receive the loan.  An otherwise
"eligible recipient" failing to make the required certifications may not receive a
loan, but that does not mean all small businesses that do make the certifications are
eligible recipients.  If the certifications are considered eligibility requirements,
nothing in the statute makes them exclusive and exhaustive ones.  See Corley, 556
U.S. at 314.

32

Fourth, going beyond the part of the CARES Act that established PPP, Gateway points to a different title of the Act, one that created a non-PPP loan program for "mid-sized" businesses, which are defined as those "with between 500 and 10,000 employees." 15 U.S.C. § 9042(c)(3)(D)(i). Under that program, the Secretary of the Treasury is authorized to provide financing to lenders to make loans with favorable terms to mid-sized businesses. See id. Unlike in the PPP, those loans are not eligible for forgiveness. See id. § 9005(a)(1).

In that non-PPP program, "[a]ny eligible borrower applying . . . shall make a good-faith certification" of several things. Id. § 9042(c)(3)(D)(i). It must certify, among other things, that: it needs the money because of uncertain economic conditions; it will use the funds to "retain at least 90 percent" of its workforce; it is an "entity or business that is domiciled in the United States with significant operations and employees located in the United States;" it "will not outsource or offshore jobs for the term of the loan and 2 years after completing repayment of the loan;" and it will "remain neutral in any union organizing effort for the term of the loan." Id. The borrower must also certify that it "is not a debtor in a bankruptcy proceeding." Id.

Gateway argues that because Congress listed non-bankruptcy status among the certifications that must be made in the mid-sized program but not in the PPP, that unambiguously shows that bankruptcy debtors are eligible for PPP loans. The

33

argument is based on the familiar canon that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (quotation marks omitted).  But, as we have noted, that canon supports "only a presumption, and a rebuttable one at that" which "must yield" to contrary textual evidence.  Hope v. Acorn Fin. Inc., 731 F.3d 1189, 1192–93 (11th Cir. 2013) (quotation marks omitted).  And even more to the point for present purposes, because silence "may signal permission rather than proscription," the fact "that Congress spoke in one place but remained silent in another, as it did here, rarely if ever suffices for the direct answer that Chevron step one requires." Catawba Cnty., N.C. v. EPA, 571 F.3d 20, 36 (D.C. Cir. 2009) (quotation marks omitted). When we compare the two programs at issue here, Congress' comparative silence is not enough to overcome the ambiguity and end the analysis.  Congress did not, after all, specify in the PPP part of the CARES Act that being in bankruptcy was not a disqualification, which it could easily have done.

Unlike the PPP, the mid-sized loan program was created as a new standalone program and was not added into an existing one like § 7(a) with existing requirements, regulations, and agency administration.  In light of that, Congress speaking specifically in the mid-sized program but not in the PPP does not carry

the day for Gateway's argument.   As we've said: context is king.  See Wachovia

Bank, 455 F.3d at 1266–67.  By placing PPP within an existing loan program,

staying silent about its longstanding sound value requirement while specifically

changing other requirements, delegating rulemaking authority to the SBA, and

remaining silent about bankruptcy status, Congress could reasonably have meant

for the SBA to use its expertise to fill that gap.  See Catawba Cnty., 571 F.3d at 36

("When interpreting statutes that govern agency action, we have consistently

recognized that a congressional mandate in one section and silence in another often

suggests not a prohibition but simply a decision not to mandate any solution in the

second context, i.e., to leave the question to agency discretion.") (quotation marks

omitted).

Fifth, Gateway also points out that the provisions of the CARES Act that

address bankruptcy related issues don't indicate that bankruptcy debtors should be

excluded from the PPP.  For example, the Act excludes from the bankruptcy code's

definition of "current monthly income" any "[p]ayments made under Federal law

relating to the national emergency" of COVID-19.  11 U.S.C.

§ 101(10A)(B)(ii)(V).  As Gateway sees it, that unambiguously shows bankruptcy

debtors are eligible to receive PPP loans.  But the "[p]ayments made under Federal

law" that are mentioned in the Act go well beyond those in the PPP.  So that

35

provision does not provide a clear answer to the question before us about PPP eligibility.

Sixth, and finally, Gateway falls back on a much broader claim, stressing that PPP functions more like a grant than a loan because PPP loans are designed to be forgiven. The implication is that if Congress wasn't concerned about repayment, it must have intended for bankruptcy debtors to be eligible. And along those lines, because Congress' goal was to keep small businesses afloat and workers employed, it must have intended for bankruptcy debtors to be included in the program.

But PPP loans are forgiven only to the extent that the funds are used for certain expenses. See 15 U.S.C. § 9005(b). And even some of the "allowable uses" of PPP loans do not fall within the expenses for which loan forgiveness is available. Compare id. § 636(a)(36)(F), with id. § 9005(b). Limiting loan forgiveness, putting the PPP into § 7(a), and maintaining § 7(a)'s sound value requirement, all show some concern about loan repayment. We cannot say that Congress had no concern with repayment. If anything, maintaining the sound value requirement could indicate an intention to preserve PPP funds for only those businesses that would otherwise be stable but for the COVID-19 pandemic, which could exclude businesses that were already in bankruptcy. The mix of arguments about including or excluding bankruptcy debtors evidences a situation with the

36

kind of questions that Congress might well decide to leave to the expertise of an agency like the SBA.

The takeaway is: None of the individual statutory provisions that Gateway relies on provides an unambiguous answer to the question of whether bankruptcy debtors are eligible for PPP loans. Nor does the sum of those provisions. Cf. Friends of the Everglades, 570 F.3d at 1225 ("The broader context of the statute as a whole does not resolve the ambiguity.") (quotation marks omitted). Instead, the text of the CARES Act shows Congress placing the PPP within § 7(a), leaving intact the sound value requirement, and delegating rulemaking authority to the SBA. That is all the more important because in the Act Congress expressly made some changes to § 7(a)'s requirements, showing it knew how to alter them for PPP loans and how to delegate to the SBA the question about whether to alter others.

Having concluded that Congress did delegate to the SBA the question of whether bankruptcy debtors are eligible for PPP loans, we move to step two, which asks whether the answer the SBA provided to that question is a reasonable one.[9]

_____

[9] Though we have previously expressed "concerns about the use of legislative history materials, we [have] recognize[d] that this Court and the Supreme Court have used them to decide whether congressional intent is clear under the first step of Chevron." Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1273–74 (11th Cir. 2009). To the extent it is appropriate to consider legislative history in a Chevron inquiry, it is not helpful in this case. Our research reveals only one mention of bankruptcy status, a floor statement in which a Senator suggested that he thinks "the bill has a stipulation in it that, if you declare bankruptcy after March 1, you will be eligible for this plan." 166 Cong. Rec. S1863 (daily ed. Mar. 20, 2020) (statement of Sen. Mike Enzi). That "stipulation" did not make it into the text of the CARES Act, and it's anyone's guess as to why it didn't. The Second Circuit has noted that legislative

B.  Step Two

Because the Act does not unambiguously answer the question before us, we must defer to the SBA's interpretation of "eligible recipient" if it is reasonable. Chevron, 467 U.S. at 844.  In gauging the reasonableness of that interpretation, it does not matter if the SBA's is "the reading [we] would have reached if the question initially had arisen in a judicial proceeding," because we cannot substitute our own judgment for the SBA's.  Friends of the Everglades, 570 F.3d at 1227–28 (quotation marks omitted).  Instead, we consider only whether the SBA's interpretation is rational.  Regions Bank, 936 F.3d at 1190 (quotation marks omitted).  It is.

Congress gave the SBA only 15 days to issue rules, which is practically warp speed for regulatory action, a command that undoubtedly sprang from the felt need for quick action in light of the burgeoning economic crisis stemming from the pandemic.  Even though the purpose of the PPP was to quickly help small businesses in distress or before they became distressed, as we have stressed and stressed again, Congress did put the program in § 7(a), which has a sound value requirement that applies to "all" § 7(a) loans.  See 15 U.S.C. § 636(a)(6).  In that way, it identified "manifestly competing interests" that it "intended to

---

history will "rarely speak with sufficient clarity to permit us to conclude . . . that Congress has directly spoken to the precise question at issue." Cohen v. JP Morgan Chase & Co., 498 F.3d 111, 122 (2d Cir. 2007). This is not one of those rare — and practically unicornical — times.

accommodate." Chevron, 467 U.S. at 865.  But it did not accommodate them with specificity when it came to whether bankruptcy debtors are eligible for PPP loans. It left that to the SBA.

The SBA's interpretation of the CARES Act and § 7(a) was a reasonable accommodation of those interests.  One way it reconciled the competing interests was by replacing its usual lending criteria with a simple bright-line proxy based on bankruptcy status.  See Chevron, 467 U.S. at 865; see also Animal Legal, 789 F.3d at 1215 ("Unlike courts . . . agencies possess invaluable technical expertise and, by virtue of their accountability to the President, are a proper forum to make policy choices based on unresolved competing interests.") (quotation marks omitted). Given all of the circumstances and the urgency with which it was forced to act, the SBA's interpretation was reasonable.  "We do not say this is an inevitable interpretation of the statute; but it is assuredly a permissible one." Sullivan v. Everhart, 494 U.S. 83, 93 (1990).

## V.  THE SBA'S RULE IS NOT ARBITRARY AND CAPRICIOUS

Even when an administrative agency did not act "in excess of statutory jurisdiction," 5 U.S.C. § 706(2)(C), it still may have acted arbitrarily and capriciously, id. § 706(2)(A).  We have said that an agency action is arbitrary and capricious if the agency did one of four things: "[1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an

important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ga. Dep't of Educ. v. U.S. Dep't of Educ., 883 F.3d 1311, 1314 (11th Cir. 2018) (quotation marks omitted).

"The arbitrary and capricious standard is exceedingly deferential" and "[w]e are not authorized to substitute our judgment for the agency's as long as its conclusions are rational." Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009) (quotation marks omitted). Our "role is to ensure that the agency came to a rational conclusion, not to conduct [our] own investigation and substitute [our] own judgment for the administrative agency's decision." Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008) (quotation marks omitted). "Our deference extends both to an agency's ultimate findings as well as [to] drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs, 833 F.3d 1274, 1285 (11th Cir. 2016) (quotation marks omitted). Still, we are not a rubber stamp — "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." Judulang v. Holder, 565 U.S. 42, 53 (2011).

We begin our consideration of the SBA's action by noting that this case is unusual in one significant respect. Normally, an agency's explanation for a rule is connected to the "relevant matter presented" during the notice and comment period. See 5 U.S.C. § 553(c) ("After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise and general statement of their basis and purpose."). Here, though, Congress did away with the notice and comment period by ordering the SBA to issue regulations "without regard to the notice requirements" under 5 U.S.C. § 553(b). 15 U.S.C. § 9012; cf. 5 U.S.C. 553(c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making . . . .") (emphasis added). And it gave the SBA barely more than two weeks to issue the regulations. The inevitable result is a far more limited administrative record than we might otherwise have had.

We can and do consider the SBA's contemporaneous explanation of the eligibility rule all the same. See Dep't of Comm. v. New York, 139 S. Ct. 2551, 2573 (2019). The explanation the SBA gave is that bankruptcy debtors "would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans." 85 Fed. Reg. 23,450, 23,451 (Apr. 28, 2020). It reached that conclusion after consulting with the Secretary of the Treasury, id., which means that the expertise of two agencies was brought to bear on the issue.

Gateway, as the bankruptcy court did, takes issue with the SBA's explanation. It argues that the bankruptcy process ensures the authorized use of PPP funds and the repayment of any unforgiven loans. Those arguments go mainly to whether the SBA was arbitrary and capricious because it either "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence before the agency," or gave an explanation that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ga. Dep't of Educ., 883 F.3d at 1314 (quotation marks omitted).

We cannot say that the SBA failed to consider any important aspect of the problem, or offered an explanation contradicted by evidence that was put before it — there was no evidence put before it. Nor can we say that the SBA's explanation was implausible, much less that it was so implausible that it could not have been based on a difference in view or could not be a product of the SBA's expertise. Bankruptcy debtors are financially distressed and have competing creditors, which it is not implausible to believe will increase the risk of unauthorized use of funds and non-repayment. We will not substitute our view for the SBA's judgment that the gravity of the risk is "unacceptably high." The SBA has long considered bankruptcy status as relevant to § 7(a)'s sound value requirement and creditworthiness regulations. That it fashioned its consideration

42

of bankruptcy status into a streamlined and bright-line rule that would speed up decisions about whether PPP loans should be made is not implausible, irrational, or the product of arbitrary and capricious decision making.

The SBA did not rely "on factors which Congress has not intended it to consider." Ga. Dep't of Educ., 883 F.3d at 1314 (quotation marks omitted). It relied primarily on two factors: the risk of unauthorized use of funds and the risk of non-repayment. The unauthorized use of funds was clearly a relevant factor, because Congress had defined a specific list of "[a]llowable uses" for PPP loans, 15 U.S.C. § 636(a)(36)(F), and a specific list of costs for which loan forgiveness would be available, id. § 9005(b). And Congress indicated that the risk of non-repayment was a relevant factor by adding PPP into § 7(a) and maintaining the sound value requirement, which is implemented by creditworthiness regulations.

## VI.  CONCLUSION

The SBA did not exceed its authority in adopting the non-bankruptcy rule for PPP eligibility. That rule does not violate the CARES Act, is based on a reasonable interpretation of the Act, and the SBA did not act arbitrarily and capriciously in adopting the rule. The bankruptcy court committed an error of law in concluding otherwise in its approval order and its preliminary injunction order.

We VACATE the bankruptcy court's approval order and its preliminary injunction order and REMAND the case to the bankruptcy court for further

proceedings consistent with this opinion.  And we DISMISS the appeal from the

memorandum opinion for lack of jurisdiction.[10]

**DISMISSED in part, VACATED in part, and REMANDED.**

---

[10] USF asks that we order the loan agreement that it entered with Gateway rescinded.  It appears that USF failed to request that relief from the bankruptcy court.  We decline to address the rescission issue in the first instance and leave it to the bankruptcy court to consider it on remand in light of our opinion in this case.  See Callahan v. United States Dep't of Health & Human Servs. through Alex Azar II, 939 F.3d 1251, 1266 (11th Cir. 2019) ("We are, after all, a court of review, not a court of first view.").